IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RYLAN M.**, by **ANGELA M. and BRIAN W.**, Plaintiffs, | : : : : | Civil No. 1:16-CV-1260 |
| v. | : : | |
| **DOVER AREA SCHOOL DISTRICT**, Defendant. | : : : : | Judge Sylvia H. Rambo |

# **M E M O R A N D U M**

This case concerns the education of Rylan M.,[1] an elementary school-age student enrolled in the Dover Area School District ("District"). Rylan is a protected handicapped student under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), and has had a 504 Service Plan since December 2014.

Currently before the court is Rylan's motion for judgment on the administrative record, (Doc. 9) in which Rylan asks the court to reverse the Hearing Officer's decision that the District is not required to provide Rylan with a medically trained dedicated aide in order to comply with its obligations under the Rehabilitation Act to ensure that Rylan is given access to free appropriate public education ("FAPE").

---

[1] Plaintiffs in the case are Rylan M., a minor, by and through his parents, Angela M. and Brian W. For ease of reference, and because this case involves the education of Rylan, the court will refer to Plaintiffs collectively as Rylan throughout this memorandum.

The court has thoroughly reviewed the administrative record, and for the reasons that follow, will deny Rylan's motion for judgment on the administrative record. Specifically, the court affirms the Hearing Officer's decision that the District is not required to provide Rylan with a medically trained dedicated aide under the Rehabilitation Act.

I. **Factual Background**[2]

Rylan is diagnosed with Ehlers-Danlos syndrome, a complication of which is Postural Orthostatic Tachycardia Syndrome ("POTS"). (Doc. 7, Certified Admin. R., Ex. 2, Decision of Due Process Hr'g at 2, ¶ 1 ("Due Process Hr'g").) POTS involves "severe dysfunction of the autonomic nervous system, and includes varied symptoms such as severe dizziness and fainting, headaches, severe fatigue, difficulty with concentration, heat or cold intolerance, palpitations and chest pain, weakness[,] and abdominal discomfort." (*Id.* at 2-3, ¶ 2.) Although Rylan's fainting spells due to his POTS have been infrequent, he has fainted twice in three and a half years. (*Id.* at 4, ¶ 14.)

In late 2014, the District developed an initial service agreement under Section 504 of the Rehabilitation Act and Chapter 15 of the Pennsylvania Code ("504 Plan"), with implementation beginning on January 21, 2015 prescribing

---

[2] In accordance with the standard of review in Individuals with Disabilities Education Act ("IDEA") cases, *supra* Section III, this court has reviewed the administrative record and the Hearing Officer's findings of fact, and concludes that they are correct. As such, the facts provided herein are adopted from those finding.

certain accommodations necessary to support Rylan at school. These accommodations, which were recommended by Rylan's pediatrician, pediatric cardiologist, and parents, included having unlimited access to water and the restroom, being accompanied to the restroom by a buddy, permitting extra time for homework and testing, and providing forbearance for frequent tardiness and/or absence. (*Id.* at 3, ¶¶ 5-6.) The 504 Plan also required that, "[i]f student reports dizziness, light-headedness, or feeling of passing out, call nurse to escort to health room for evaluation."[3] (*Id.* at 3, ¶ 9.)

On March 1, 2016, Rylan's teacher, who was knowledgeable of Rylan's 504 Plan, overheard him telling a classmate that he thought he "was going to be sick." (*Id.* at 4, ¶ 11.) However, the teacher believed that Rylan was suffering from a gastrointestinal condition that many of the children in the school had at the time, as opposed to pre-fainting symptoms. (*Id.* at 4, ¶ 12.) The teacher sent Rylan to the nurse's office where he fainted, fell from the chair, and sustained a concussion while waiting for the nurse. (*Id.* at 4, ¶ 13.)

---

[3] The initial 504 Plan was modified on August 21, 2015, with another proposed modification dated January 21, 2016. (Due Process Hr'g at 3, ¶ 7.) The Hearing Examiner noted that there is some dispute as to whether the August 21, 2015 Plan or the January 21, 2016 Plan was in effect at the time of the March 1, 2016 fainting incident, which will be described herein. (*Id.*)

After this fainting incident, on March 17, 2016, the District convened a meeting in order to discuss proposed modifications to Rylan's 504 Plan. (*Id.* at 4, ¶ 17.) Unlike its predecessors, the proposed March 17, 2016 Plan[4] reads as follows:

> If student reports or shows signs of any of the following symptoms: severe dizziness, fainting, headaches, severe fatigue, difficulty with concentration, heat or cold intolerance, palpitations, chest pain, weakness, and abdominal discomfort, have student lie on floor immediately and then call nurse for a wheelchair escort to the health room for evaluation.

(*Id.* at 4, ¶ 19.) After this meeting, Rylan's parents asked the principal for a dedicated aide. (*Id.* at 5, ¶ 21.) However, none of the specialists who treated Rylan for POTS or for his concussion have ever, either before or after the March 1, 2016 incident, recommended a dedicated aide for Rylan. (*Id.* at 5, ¶ 22.) In a letter dated March 17, 2016, the physician treating Rylan's concussion provided several recommendations, none of which were for a dedicated aide. (*Id.* at 5, ¶ 23.) Rylan's neurologist recommended several interventions including keeping a diary of food, fluid intake, and sleep in a letter dated April 4, 2016, but did not recommend a dedicated aide. (*Id.* at 5, ¶ 24.) In a report dated May 1, 2016, Rylan's pediatric cardiologist indicated that Rylan had no barriers to learning and recommended several possible interventions, such as a cooling vest and adequate fluid intake, but did not suggest the need for a dedicated aide. (*Id.* at 5, ¶ 25.)

---

[4] As of the date of the Hearing Officer's decision, the proposed March 17, 2016 Plan was not yet approved, although the District was in the process of implementing it. (*Id.* at 6, ¶ 41.)

While none of these specialists recommended a dedicated aide, Rylan's parents asked Rylan's pediatrician to recommend a dedicated aide. (*Id.* at 5, ¶ 28.) In a letter dated April 12, 2016 addressed to parents' counsel, Rylan's pediatrician stated that he would "support the following accommodations," the first of which was a "medically trained aide to be immediately available to [Rylan] throughout the entire school day." (*Id.* at 5, ¶ 29.) In a second letter dated April 25, 2016, the pediatrician stated that "it is a reasonable accommodation to have a nurse or medically trained aide in near proximity to [Rylan] in school and at other locations away from home such as summer programs." (*Id.* at 5, ¶ 30.) The pediatrician later explained, while testifying before the Hearing Officer:

> I would foresee this person as being available to [Rylan] . . . I think that as much as possible that I would . . . hope for . . . 95 percent of the day this person could be available to [Rylan]. . . . [W]e're going to be depending on [Rylan] a lot to give us these early warnings and . . . if [Rylan] has an upset stomach or a headache . . . [Rylan] can't be treated like another child because . . . this could rapidly progress to a fainting episode, but I think . . . a medically trained person could keep an eye on [Rylan] and if [he] looks pale or is not acting right[,] could intervene to . . . see if [he] needs to be taken to the nurse's office.

(*Id.* at 6, ¶¶ 31-33.) The pediatrician defined "medically trained" as someone with training as a medical assistant or higher. (*Id.* at 6, ¶ 34.) The District's school nurse, on the other hand, testified that she was confident that Rylan did not require

5

a dedicated aide. (*Id.* at 6, ¶ 36.) She testified that, as a school nurse, she has had students with fainting disorders, neurological disorders, and seizure disorders. (*Id.*)

Since the incident, the District has developed a medical alert poster with Rylan's picture on it, which was placed in the nurse's office as well as in a folder on his teacher's desk to ensure that substitute nurses and teachers are aware of Rylan's condition. (*Id.* at 6, ¶ 37.) The school nurse has provided training to District staff regarding Rylan's condition, and will continue to provide ongoing training to other staff that have any contact with Rylan. (*Id.* at 6, ¶ 38.) Additionally, the District has developed a schedule where, as much as possible, there are always at least two adults in close proximity to Rylan, all of whom are trained as to the symptoms to look for and the corresponding actions to take. (*Id.* at 6-7, ¶ 39.)

## II.     **Procedural Background**

On April 5, 2016, Rylan's parents filed a due process complaint with the Office for Dispute Resolution seeking an order directing the District to provide Rylan with a medically trained dedicated aide as part of the District's obligations to ensure Rylan receives a FAPE. (Doc. 7, Ex. 9.) The due process hearing was held on May 16, 2016, and the Hearing Officer issued her decision on June 4, 2016. (Doc. 7, Ex. 2.) The Hearing Officer concluded that the District was not required to provide a medically trained dedicated aide as part of Rylan's 504 Plan.

On June 23, 2016, Rylan filed a complaint with this court appealing the Hearing Officer's decision (Doc. 1), which the District answered on September 27, 2016 (Doc. 8). Rylan subsequently filed a motion for judgment on the administrative record on October 14, 2016 (Doc. 9), with the District filing its opposition on October 28, 2016 (Doc. 11). Thus, the motion has been fully briefed and is ripe for disposition.

### III. <u>**Legal Standard**</u>

In cases involving the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, district courts apply a modified *de novo* standard of review, "under which factual findings from the administrative proceedings are to be accorded 'due weight.'" *J.N. v. S.W. Sch. Dist.*, Civ. No. 14-cv-974, 2015 WL 5512291, *6 (M.D. Pa. Sept. 15, 2015) (citing *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009)). Under this standard, the hearing officer's factual findings are to be considered *prima facie* correct, although the court may deviate from those findings as long as it articulates its reasons for doing so. *Id.* (citing *S.H. v. State–Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)). Additionally, the court must accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Id.* (citing *S.H.*, 336 F.3d at 270). Although courts are

7

divided as to whether the modified *de novo* standard applies in the Rehabilitation Act context, it is unnecessary to resolve this issue in this case. The court has the discretion to defer or not to defer to the Hearing Officer's findings and notes that its holding would remain the same under either the *de novo* standard or the modified *de novo* standard.[5]

The district court's review of the hearing officer's application of legal standards and conclusions of law, on the other hand, is subject to plenary review. *Id.* at 7 *(*citing *Jana K. ex rel. Tim K. v. Annville–Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014)). However, the district court is not "to substitute its own notions of educational policy for those of local school authorities." *Id.* (citing *S.H.*, 336 F.3d at 270). On appeal before the district court, the burden of persuasion lies with the party challenging the administrative decision. *Ridley Sch. Dist. v. M.R* ., 680 F.3d 260, 270 (3d Cir. 2012). In the case *sub judice*, plaintiffs bear the burden of demonstrating that the Hearing Officer's decision was erroneous.

---

[5] While IDEA is phrased in terms of a state's affirmative duty to provide a FAPE, the Rehabilitation Act is framed as a negative prohibition against disability discrimination in federally funded programs. *See W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995). The Third Circuit has noted that there "appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition," with the regulations implementing § 504 adopting the IDEA's language that requires schools that receive or benefit from federal financial assistance to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction." *Id.* (quoting 34 C.F.R. § 104.33(a)).

## V. **Discussion**

In order to prevail on a Rehabilitation Act claim, Plaintiffs must prove that: (1) Rylan is disabled under the law; (2) Rylan is "otherwise qualified" to participate in school activities; (3) the school district is a recipient of federal financial assistance; and (4) Rylan was excluded from participation in, or denied the benefits of education as a result of the school district's failure to provide reasonable accommodations. *Ridgewood Bd. of Ed. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999). Because the parties agree that Rylan meets the criteria for a Rehabilitation Act claim, the only issue before the court is the extent of the accommodations necessary to provide Rylan with an appropriate education. To offer an "appropriate" education under the Rehabilitation Act, a school district "must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Ridley*, 680 F.3d at 280. However, § 504 does not require "substantial" changes to school programs, and courts "should be mindful of the need to strike a balance between the rights of the student and [his] parents and the legitimate financial and administrative concerns of the school district." *Id.* at 280-81 (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 405 (1979); *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70-71 (2d Cir. 2000)).

In his motion for judgment on the administrative record, Rylan primarily argues that the Hearing Officer erred by disregarding the family pediatrician's testimony, which is the central basis of Rylan's position that a dedicated aide is required. The Hearing Officer found the pediatrician "to be testifying as a strong advocate for [Rylan's] position rather than offering an expert objective opinion to assist the fact-finder." (Due Process Hr'g at 9.) Additionally, while the Hearing Officer noted that the pediatrician did "answer in the affirmative to the question of whether the aide was medically necessary," this answer was given only upon his third round of questioning at the hearing. *Id.* The Hearing Officer also observed that all other references to the need for an aide in the pediatrician's written correspondence were couched in terms of a "reasonable accommodation." *Id.* Based on these considerations, the Hearing Officer did not give the family pediatrician's testimony full weight. *Id.* Because Rylan has not pointed to anything in the record that would justify a contrary conclusion, the court is not in a position to second-guess the Hearing Officer's credibility determinations.

As noted by the Hearing Officer, the family pediatrician himself testified that "we are going to be 'depending on [Rylan] a lot to give us these early warnings,'" and that a medically trained aide would "keep an eye on [Rylan]" and take him to the nurse's office "if [he] looks pale or is not acting right." (Due Process Hr'g at 10.) The Hearing Officer reasoned that "training as a medical

assistant or higher" is not required "to ascertain what can be observed by staff in a school setting," and that Rylan has "adduced no evidence that the person[s] who are occasionally left to care for [him] at home have medical training." *Id.*

Additionally, none of the medical providers who examined Rylan after his concussion recommended a dedicated aide. While Rylan argues that the treatment notes provided by these medical providers were only general recommendations, the record shows that the notes, a March 17, 2016 letter from the physician treating his concussion, an April 4, 2016 letter from his neurologist, and a May 1, 2016 letter from his pediatric cardiologist, actually include specific recommendations, such as keeping a diary of food and fluid intake, wearing a cooling vest, and refraining from gym class. (*Id.* at 5, ¶¶ 23-25.) Rylan also argues that these medical providers rely on the local specialist, the family pediatrician, to communicate with the school. However, the letters from these medical providers fail to support this proposition or support the assertion that an aide was in fact warranted.

Although she is not a doctor, the school nurse testified that she did not think Rylan required a dedicated aide given that he has "been able to articulate that he is going to have a problem" and that "there is a teacher . . . in the classroom that we've given what to look for." (Doc. 7, Ex. 5, Tr. at 145.) While the school nurse is not qualified to give an expert opinion on the medical necessity of a dedicated

11

aide, the court finds that she is qualified to provide input on the interventions necessary to ensure Rylan receives appropriate care in school. This assessment is based on multiple factors, including her familiarity with Rylan and her experience as a registered nurse for twenty years, with fifteen of those years in pediatrics or cardiology, and nine as a school nurse working with students with fainting disorders, neurological disorders, seizure disorders, and other special needs. (Due Process Hr'g at 6, ¶ 35.)

Lastly the court will address the two incidents in which Rylan argues he was denied a FAPE due to the unavailability of a dedicated aide: 1) when he was not permitted to accompany another student on a classroom errand; and 2) when he was assigned to the nurse's office while the class was taking a standardized test.

In *Ridley School District v. M.R.*, the Third Circuit found no obligation for the school district to ensure that the student had the exact same experience as her peers. *Ridley*, 680 F.3d at 282. The fact that the student's daily routine was necessarily different from her classmates did not form the basis for a § 504 violation. *Id.* The Third Circuit found that the school district, by modifying the student's snack in a food-related class activity and asking the student to wear gloves in a sand, pebbles, and gravel lesson, took reasonable steps to accommodate the student's disabilities and include her in all class activities. *Id.* In the instant case, an errand to deliver folders to a school office is distinct from a class activity

that is part of an educational program meant to provide significant learning, and preclusion from this activity does not constitute a denial of FAPE.

As for the second alleged denial of an appropriate education, the record establishes that when Rylan was assigned to the nurse's office during a test administration, he was the only student not taking the science portion of the test. (Doc. 7, Ex. 5, Tr. at 220.) In similar instances where there were other students not taking a portion of a test, the students, including Rylan, were assigned to the library with a teacher and an aide. (*Id.* at 221.) In this instance, Rylan's concussion doctor had recommended that he be excused from the test due to the concussion and the District was merely complying with that recommendation. (*Id.* at 85.)

## VI. <u>Conclusion</u>

Based on the foregoing discussion, the court concludes that Rylan has not met his burden of demonstrating that the Hearing Officer's decision was erroneous. Accordingly, the court will deny Rylan's motion for judgment on the administrative record seeking to reverse the Hearing Officer's decision that the District is not required to provide a dedicated aide for Rylan. An appropriate order will issue.

s/Sylvia Rambo<br>
SYLVIA H. RAMBO<br>
United States District Judge

Dated: May 9, 2017